BOLIN, Justice
(concurring specially).
Despite the number of writings, this is not a difficult case. In addition to all five judges on the Court of Civil Appeals, eight of nine Justices on this Court are voting to affirm the judgment of the trial court placing primary custody of the four-year-old child in the hands of the maternal grandparents.
I fully concur with the main opinion that the record supports the trial court’s finding that the father had voluntarily relinquished custody of the child to the maternal grandparents and that the record contained clear and convincing evidence that the father was unfit. I also join the special writings of Justice Stuart and Justice Smith. I write specially to address portions of Justice Parker’s dissent.
The dissent maintains in part that the evidence does not establish that the father knew of his right to custody. I believe that the record demonstrates that the father was well aware that he had legal rights to this child. In June 1999, two months after the child was born, the father requested a paternity test, which established his paternity. In August 2000, the father filed a declaration of legitimation as to the child in the probate court. In April 2002, he intervened in legal proceedings between the mother and the maternal grandparents regarding the custody of the child. In August 2002, the father entered into an agreement before the court establishing with the mother joint legal and physical custody of the child. In October 2002, the father and the maternal grandparents filed a joint petition to modify custody. It appears from the record that instead of the father’s being ignorant of his rights to his own child, he was more aware of his parental legal rights than are most unwed fathers, and he made the conscious decision to forsake his parenting responsibilities, waiting nearly four years to finally request full legal custody.
Much of the dissent, especially as it pertains to the groundwork the Founders of our republic established for our government, is correct and would be well-placed in an opinion that does not deal with the custody of a four-year-old child. I agree with the characterization of the view of our country’s Founding Fathers that God, not *667 the state or any government established by man, is the source of all our rights. I strongly contend, however, that this same God also imbued in each of us a sense of responsibility and compassion that should make us recoil from the concept of protecting parental rights to the detriment of a child’s safety, well-being, and welfare.
I further agree that parents have a God-given right and responsibility to rear their children and that they should be allowed to do so unfettered by state interference. But this can be true only when a parent accepts that right and responsibility. In this matter, the father not only did not accept his parental duty, he abdicated it.
The father in this case voluntarily let the infant child remain in the care of the maternal grandparents after the mother had left the child. Over the next three years, the father virtually abandoned the child' — -seeing the child only a few times each year. The father, measured by any standard of parental responsibility, financially abandoned the child. The father has never even spent 24 hours alone with the child and readily admits that a change in custody from the maternal grandparents would traumatize the child. The father also admits that he abandoned a former girlfriend once he found out she was pregnant.
The maternal grandparents filled the void left by both parents’ abdication of their parental roles. It was the maternal grandparents who loved, nurtured, fed, clothed, and took care of this child, while the father, at times, placed going out on a date ahead of his precious right to visit with his child. This child was bonding, day by day, with the only people in this world taking care of him while the father was growing up and finding himself.
The dissent quotes several definitions of “government” from Noah Webster’s American Dictionary of the English Language (Foundation for American Christian Education 1995) (1828). I find most telling, and most apropos to the facts in this proceeding, the illustration by Webster provided for the fourth definition, concerning the sphere of family government, as set out therein: “ ‘Let family government be like that of our heavenly Father, mild, gentle, and affectionate.’ ” 924 So.2d at 675. In acknowledging that our Heavenly Father is a loving and affectionate God, I must question where has been the love, gentleness, and affection shown by this earthly father, the appellant in this proceeding, to his child? It is, according to the record, largely nonexistent.
The record reflects that the mother and the father never married. They do not live, and have not lived, together. Since her overdose on heroin, the mother does not seek custody. The father has been irresponsible as a parent for the entire life of the child. Under these circumstances, it was the maternal grandparents who offered the only “family government” support system of which Webster’s definition speaks so highly, and which the child in this case so desperately needed.
The very best government for a free society is a limited government. But a “limited government” serves its most noble purpose when called upon to protect those not able to protect themselves — most notably, the children. We should never reach the point where we confuse constitutional philosophy concerning limited government with a court’s custodial determination for a child whose parents have failed him. Let us not forget that if the father in this case had appreciated and loved this child since the child’s birth, we would not now be entertaining this proceeding.
The dissent goes on to state that “courts should interfere as little as possible with parental decision-making, instead defer *668 ring to parental authority whenever it has not been fundamentally compromised by substantial neglect, wrongdoing, or criminal act.” 924 So.2d at 677-78 (emphasis added; footnote omitted). The only fundamental compromise involved in this matter involves not “parental decision-making,” but a fundamental compromise concerning parental duty and responsibility. Unfortunately, the results of such fundamental compromises that we hear about today far too often result in harm to, or the loss of life of, a child. This father voluntarily relinquished his parental rights, and he has proven himself unfit to have custody.
It is all too easy to be heavy on rights and soft on responsibilities. If we are to refer to the “inalienable rights” of the Preamble to the Declaration of Independence, let us also refer to its conclusion: “And for the support of this Declaration, with a firm reliance on the protection of divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor.” The dissent is devoid of any suggestion that sacrifice, moral or financial responsibility, honor, or even love has any place in deciding whether a parent who has voluntarily relinquished custody of a child is entitled to what the dissent calls an “inalienable right” to primary custody.
With rights come responsibilities, male and female, husband and wife. With parental rights, ordained by God, come parental responsibilities, just as much ordained by God. In fact, we can say that the more sacred the right, the more solemn the responsibility. The defaults of the father to his divinely appointed parental responsibilities throughout his child’s life can only be described as egregious.
The Declaration of Independence affirmed a God-ordained natural order. I believe in such a natural order. Nothing in God’s order or the Declaration of- Independence, however, says that the irresponsible, immature, derelict parent in this case, who has in fact abandoned and ignored his child throughout the child’s life, has the essential right to remove the child from the care and custody of its maternal grandparents, who have provided the child with the only love and compassion or semblance of hearth and home the child has ever known.
The learned trial judge heard the evidence and observed the demeanor of the witnesses. The trial judge was on the firing line and showed a proper concern for the custodial needs of the child in this proceeding, a child who was bereft of parental care, parental protection, and parental nurturing. “The trial court is in the best position to make a factual determination — it hears the evidence and observes the witnesses.” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994). The trial court’s opinion is supported by the record; it is not plainly and palpably in error; and the evidence of the father’s fitness should not be reweighed.
“ ‘[O]ur standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App.1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App.1985).’ ”
*669 Perkins, 646 So.2d at 47 (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)).
While Justice Parker correctly notes that parents generally know what is best for their children and act accordingly, we are not here dealing with generalities. Generalities are easy. What is not easy is the trial court’s duty to deal with the horrible circumstances of the real life upbringing of an innocent, unfortunate child who has been abandoned because of the drug addiction and gross dereliction of his parents — a regrettable and all-too-eommon occurrence in the courts of Alabama.
The problem in this case lies with the child’s mother and father, not the decision of the trial court. By awarding primary custody to the maternal grandparents, the trial court has refused to sanction the father’s violation of his parental responsibilities in abandoning his proper role as father of this child.
Reversing the trial court’s judgment and awarding primary custody to the father as the dissent urges would create an immediate and grave risk of tearing the child from the only loving family he has ever known and placing this tender-aged child in the hands of a parent who was found unfit for that role by an expert trial judge who has seen the parties, listened to the testimony, and gained a much deeper knowledge of the facts and circumstances of this case than an appellate court can ever have. It would quite simply be wrong.
NABERS, C.J., and STUART and SMITH, JJ., concur.